of Public Safety, Mr. Echelberger. That's correct, Your Honor. You're up, sir. May it please the Court. Issue 1 in our brief, and Exhibit 1 to the amended complaint, is concerned with the idea that the current text of 42 U.S.C. section 1983 is not what Congress intended when it passed the Civil Rights Act of 1871. Nevertheless, this Court is powerless to scrap years of qualified immunity jurisprudence, and we recognize that. However, we do wish to preserve that issue and wanted to ensure that on these particular facts, if this Court does find qualified immunity, that it is time for the Supreme Court to revisit that issue or to visit that issue in the first place. Moving on from that and moving instead to the Fourth Amendment claims against Trooper Doe 1. I will be covering those. Ms. Isles will be covering the claims against the other officers. The lower court found a seizure took place, rightly so, just that it was objectively reasonable and that no jury could find for Baby Lomelo's estate. The lower court then went on to find that even if the seizure was unreasonable, that qualified immunity would protect all of the officers, as the law did not clearly establish that Lomelo was not to be shot. As the Supreme Court has repeatedly instructed, excessive force cases require a careful analysis of the facts, and given that we are at the pleading stage and this Court is reviewing the grant of 12b6 and 12c motions, the facts pled are to be treated in the light most favorable to the plaintiff. The district court failed to conduct that careful analysis and instead created a bright-line rule that any time anyone shoots at an officer, it is per se objectively reasonable for law enforcement to shoot back. That is not the law. Instead, the court must do, as stated, a careful analysis of the facts alleged in the light most favorable to the plaintiff, and the lower court here did not do that. The district court wholly failed to consider the pled facts that Lomelo was knowingly, directly in the line of fire of each of these officers, that each officer fired their weapons at Lomelo, and that the officers fired their weapons not only in the direction of an innocent baby, but also in the direction of the stranded motorists who were behind the car Lomelo was in. So would it have been more reasonable to allow Smith to shoot at them without returning fire? I think there is already instruction as to that situation in Scott v. Harris. In Scott v. Harris, the court talks about the paramount governmental interest of public safety. Certainly, officer safety is a governmental interest, but it is not the paramount government interest. And here, those officers, to a person, had all been trained that they were not to fire if they were going to shoot an innocent person. That's why it took hours. Is there, can you point to any case from any jurisdiction where a court has held that returning fire at an active shooter is unreasonable? There is not a case where we have facts like this. There are cases that clearly establish that what they did was improper. Primarily, that's Kuhn in the line of cases from Kuhn v. Ledbetter over the last four decades. But here, specifically, these facts are so shocking and egregious, again, because law enforcement officers are trained not to shoot an innocent baby or through one in order to acquire their target. This is such a rare set of facts that, again, rare, but already beyond debate as to the constitutionality and the appropriateness of it, that no, we don't have that situation. Typically, what we see and what the lower court relied upon are cases in which the plaintiff was the shooter. And here, the district court, in many ways, analyzed this as if Lamella was the shooter, and that's improper. Instead, you know, again, Scott v. Harris, I mentioned that, and the paramount governmental interest. Scott v. Harris, in a way, is, or can be twisted. The facts can be changed just a hair to answer this directly on point. In Scott v. Harris, you had Harris driving at 85 miles an hour down two lane roads in Cowena County, Georgia, needlessly endangering, recklessly endangering the public. He was a clear threat to the public at large. In that case, Officer Scott decided it was a better decision to ram the back of Harris's vehicle, knowing that he might cause serious death or serious injury or death to Harris. And he did so, and that was found to be reasonable. If there was a pedestrian between Harris's car and Scott, and Scott made the decision, I am going to drive directly over that pedestrian, knowing that I will kill this pedestrian, to stop this flight of Harris, those would be these facts. And I would posit that no court would find that to be reasonable. Here, I'm sorry. If only one officer was identified as shooting the baby, killing the baby, did all those other officers shoot and just miss? They did. There were a lot of officers that missed. Who killed the father? We don't know. Was it one of those officers that were shooting at the same time they missed the baby? It may have been that Doe 1 killed both. We're still just at the pleading stage and don't know at this point. The facts is we've been able to gather them, they're not even pled at this point yet, but the facts that we've been able to gather them is there were at least 17 projectiles recovered from the car. One bullet hit Baby Lamello, two bullets hit Eric Smith. There is possibly a graze wound to Eric Smith's head, but at this point it's just too early to tell. Did ballistics know that all those other officers fired? Yes, Your Honor. And not only did they fire, there is some question as to how many rounds in total were fired. Assuming that all law enforcement officer weapons were loaded at the start of their shifts, it would have been 57 rounds. So, Your Honor, in conclusion of my part, we believe that this is clearly established. In Coon, I believe the district court may have misread the facts there. The district court held there was a standoff inside the trailer. A closer reading of those facts would show that the standoff and the negotiations happened prior to Coon entering the trailer. He was talking to his wife before that happened. We believe Coon's good law. You're obviously very familiar with qualified immunity law, and I understand your argument. So, you say the facts are different, but as you heard me say, every one of these cases, particularly in 1983, the facts are always different. Officer shootings, etc. I mean, they are quintessentially different, but Judge Willard asked you the point of the question. So, assuming arguendo, and this is a 12B6, articulate for me what this panel would say or how the panel would say. Tell me what the panel would say. Your Honor, I think we would say, or you would say, that with respect clearly to Doe 1, and that's the part that I'm handling now, that there was indeed the possibility that a reasonable trier of fact could find that Doe 1's act of shooting was unreasonable. These facts also are, it's clearly established that these facts violate Lavello Parker's rights against unreasonable seizure because Coon, in that line of cases, tell us that firing at an enclosure where an innocent might be located inside already establishes bad law, establishes a bad act in this circuit. And here, these officers to a person knowingly shot at the innocent baby. He was in each of their sights. Thank you. Ms. Siles. Good morning, Your Honors. May it please the Court.  Your Honors, we're here today not only because one officer fired directly at an innocent baby, but because 11 of them did, as Judge Clement touched on. This was a joint operation, and every officer who fired their weapons exhibited the same unreasonable conduct, the same complete and total disregard, conscious disregard, in fact, for Lavello Parker's life. And under this Court's reasoning, Grand Staff are liable for the foreseeable consequences of their actions, which was the death of Lavello Parker. But Smith, the father, was actively firing at the officers. So why was it unreasonable for him to try to protect himself? Your Honor, Eric Smith, as we have pled, Eric Smith fired one shot in the direction of Deputy Allen, who had recklessly placed himself in the line of fire to chase his police dog. And that is certainly relevant to the reasonableness analysis under the Fourth Amendment seizure. But the trial court— Was it unreasonable for him to try to shoot him because he was in the line of fire? No, Your Honor. No, Your Honor. To be more clear, the fact that Eric Smith shot at Deputy Allen should be considered in the trial court's analysis of whether the officers who fired at Lavello Parker was reasonable. It's a totality of the circumstances analysis. And the U.S. Supreme Court has emphasized that for the last at least 40 years, beginning with Tennessee v. Garner and Graham v. Conner. And the lower court in this case did not properly conduct that analysis. The lower court overlooked two key facts pled in our amended complaint. First, Lavello Parker was directly in the line of fire. These officers, all of them who shot their weapons, fired directly at Lavello Parker. He was one with the target. That does not appear in the trial court's analysis. Second, the trial court does not acknowledge our pled fact that there were dozens of innocent bystanders sitting stationary on I-10 West, on the other side of the median, behind Eric Smith's vehicle. So when these 11 officers fired at Eric Smith's vehicle and necessarily at Lavello Parker directly, they were also firing at dozens of innocent bystanders and members of the public. And as Mr. Eichelberger touched on a moment ago, the paramount interest is the safety of the public. Traffic was stationary. They were in their vehicles stationary on I-10 West. They could not move. Law enforcement had stopped traffic. However, there were no innocent bystanders, as far as we know, on the other side of the officers in the line of Eric Smith's fire. So the only danger Eric Smith posed at that moment was to Deputy Allen, who had recklessly placed himself in the line of fire. Every other officer who fired as we pled was safely behind cover. And so in that moment, the law enforcement officers who shot made a value judgment to protect the life of their officer, even though it meant gunning down an innocent civilian, Lavello Parker, and recklessly endangering the lives of dozens of citizens behind Eric Smith's vehicle. And for that reason, Your Honor, the trial court's decision that there was no constitutional violation must be reversed. That is that bright line rule that Mr. Eichelberger referred to. What case law requires the trial court to take into account these bystanders that you made? I thought the argument was centrally focused on the baby, but I mean, I see you're adding it, but I mean, what cases are out there that put the bystanders, which were not shot, into the calculus that the district court has considered on the 12B6? Your Honor, it goes to the Fourth Amendment reasonableness analysis set forth first by the U.S. Supreme Court in Graham v. Connor, and then again in Kingsley v. Hendrickson. In Kingsley, the court set out a number of factors, and to save time, I won't read all of them unless the court would like me to, but to your point, one of those factors is whether the plaintiff was actively resisting. Another is the severity of the security of the problem at issue. And in terms of the question of the bystanders fitting into the totality of the circumstances analysis, you can look to Scott v. Harris. There, the Supreme Court stated that the reasonableness analysis should account for, quote, not only the number of lives at risk, but also their relative culpability, and also the likelihood of serious injury or death. Here, these officers who fired, when they shot, as we pled, they shot, they aimed their weapons directly at Lamello Parker and fired. That baby was virtually guaranteed to be hit, if not killed. And that weighs strongly in favor of unreasonableness. With regard to our claims against the officers who fired, but whose bullets, by the grace of God, did not strike Lamello, the lower court found we did not have standing to sue those officers. However, what the trial court did not account for is that at this pleading stage, we do not know which officer fired his or her weapon first. It is entirely possible that Trooper Doe 1 was not the first person to shoot, and that other officers fired first and encouraged Trooper Doe 1 to shoot his weapon as well. For that point, Your Honor, this court should look no further than Grandstaff. In Grandstaff, this court found that just as in Grandstaff, the firestorm that killed the plaintiff in that case was in all respects a joint operation. The Fifth Circuit found that the same recklessness and the same conscious disregard for the life of an innocent person found that there was a claim against those officers. Now, the trial court distinguished Grandstaff because in that case, they did not know whose bullet killed the plaintiff. However, what the trial court overlooks is the focus of the Grandstaff analysis was that each officer who fired his gun encouraged others to do the same. Your Honor, we contend that this is sufficient to establish a causal connection between the conduct of the 10 officers who fired and the death of Lamella Parker. I see that my time is expiring. Your Honor. Is this the original complaint? I mean, what we're dealing with, the live complaint, or is this one that has been amended? I just can't remember. We filed an amended complaint, Your Honor, when this matter was still in state court in Hines County, Mississippi. Your Honor, with regard to our claims against the other officers who shot but missed Lamella, we contend that their actions amounted to a Fourth Amendment violation. However, if this court were to find that because their bullets did not cease, these claims could probably be analyzed under the 14th Amendment under Grandstaff. All right, counsel, you've exhausted your time. Mr. Ekelberger has rebuttal time for when he comes back up. We'll hear from the other side. Thank you, Your Honor. Mr. Whitfield. Good morning, Your Honors. Just so I can get maybe a little housekeeping matter out of the way, I'm here on behalf of Michael Moran, who was one of the officers with the city of Guilford. Mr. Moran is pretty much situated like the rest of the officers, but for the Mississippi Highway Patrol officer. And at the hearing before the trial court, the plaintiff's attorney indicated that he was not contesting or not contending anything related to the, quote, ramming or the pit maneuver. And the trial court held that there was at least some contact there in the possibility of force. It didn't come up then. It hadn't come up now. Therefore, I have asked the sheriff's lawyer to kind of give me his time, which is what I'm going to do. Okay? There basically is three different issues that I want to deal with with Your Honors today. One issue that did not come up at all in terms of the argument before Your Honors this morning is the issue of standing. That was the singular most reason why the trial court said, in addition to others, why the trial court said that there is no claim against my client Moran and the deputies. Now, we don't know who the names of the highway patrolmen are. And in the complaint, the complaint clearly identifies patrolman number one as the shooter. That patrolman number one apparently, according to the complaint, indicated that that was the bullet or from his gun that was the bullet that struck Lamello Parker. That's in the complaint. It was alleged. It was amended and alleged again. It was argued at the trial court. We all are standing here before Your Honors today. Everybody acknowledges that it was the highway patrol that made contact with the baby. Not my client. Not the sheriff's deputies. So the people that are here before you today did not have any ammunition or bullet that made contact either with Mr. Smith or with Mr. Parker. Who is the highway patrol officer by name that is discerned to have been, quote, the shooter of Lamello? Is that known? I don't even know that. Does anybody know? Well, I'm sure the highway patrol knows that. We do not know that. They do not know that the county does not know that the sheriff's department does not know that the city of Gulfport does not know that nobody knows who the name. Now we can take a guess at it. I'll just say speaking for myself, it worries me on a 12 B6 to wash a case out when there still seems to I mean, there's no getting past the tragedy of this. The end result might be what it is. But it worries me to pour a case out on a 12 B6 when in this kind of fast moving circumstance, the best we can do is read stuff about John Doe and Officer 1. We're looking behind a box to figure out who's who. You've got highway patrol. You've got sheriff's deputies. I mean, you have a large matter. That's not a position against whether they should have been there. But in terms of figuring out who is or are the shooters, it just seems pretty early to be pouring a case out on that alone. I'm not saying there aren't other arguments, but I had trouble just trying to read and understand who's on first, who's on second, who's on third, who really was the shooter. Notwithstanding whether they have culpability, but I mean, where did the bullets come from that actually killed Eric Smith and the baby? If these other people didn't shoot or never pull their weapon, that's one thing. Well, Judge, I'll say this. When you say who's on first, who's on second, who's on third? I know this. My client, in terms of this analysis, is not even on the field because the highway patrolman is indicated actually in the complaint as the shooter. That was admitted to at the trial hearing. Nobody has denied it to this second that it was the Mississippi Highway Patrolman that was the shooter. As far as contact is concerned, there is no other ballistic that confirms that the shooter was anything other than a highway patrolman. So it's not really one of those things, Judge, that is murky. We know who the shooter was. It was highway patrolman number one. They pled it. We agree with that. And furthermore, we agree that it wasn't Moran, it wasn't Moskowitz, and it wasn't Allen. And those are the other three actors that are part of this equation. Now, why is that important, Judge? I know my client did at Mr. Smith. Yes. Well, I'm sure the other ones did as well. I know mine did. He missed him. All missed. All missed. Now I got my theory as to how they all missed your honor, and I'm certainly willing to share that with you. But I don't know that I want to take up that much time in dealing with it unless your honor thinks it's important. Well, here's my theory. My theory is that the last thing that any of the people out there that had a gun wanted to do was to impact that baby. And my belief is that my client erred on the side of caution to avoid coming into contact with the child. And while we're talking about the child, your honor, there really isn't any proof in this record to this second that Eric Smith, who was the shooter, the guy that was in the car, was holding Lamella Parker as a human shield, if you were, just to use that word. There's really no proof in this record that that took place. I think that the plaintiff's lawyers have surmised that, but I think it's in their brief that they acknowledge that they really don't know. We're only complaining it's a three-month-old baby. It just sort of gets past me that the three-month-old is laying in the back seat somewhere. Well, I didn't say that, your honor. No, you didn't. I was being facetious only slightly. Right. Because it's a three-month-old and, you know, it was in the car. The guy sped away. This arises from a domestic complaint where he takes the baby, et cetera, et cetera. You know, I'm watching enough TV to figure probably, you know, he does have the baby somewhere in his arm or whatever, albeit he's got a drive and all that sort of stuff. But it's just not a stretch for me that the baby isn't laying in the back seat somewhere. But my main point is that we're on complaint. Right. Because you said there's nothing in the record. There's nothing in it. Right. And we're at the 12B6 stage. I understand. There's nothing in the record as to the position of Lamello Parker in front of Mr. Smith. There's nothing in the record about it. Now, they have pled that he was there, but then they acknowledge in their brief before the court that they really don't know. And I don't know that either. I don't know that really anybody does, at least in this record. Now, I'll say this, though. The very first thing that Your Honor, that Judge McNeil dealt with was standing. Now, the elements of standing, and we cited all of those things in our brief, essentially was an injury that was traceable to the defendant, that was capable of redress, and was more than just theoretical. Now, the two first elements I want to deal with just very quickly. An injury traceable to the defendant. There is no injury in this record that's traceable to my defendant or any of the deputies that are here before the court today. Now, the Highway Patrol's not here, and I'm not here to talk good or bad about them. I'm just suggesting to Your Honors that in the record today, complaint, the Highway Patrolman, number one, is alleged to have been the shooter. Nobody else. The plaintiffs, by doing that, have admitted that there is no injury that's traceable to my client or the deputies. Now, the citation of the Grand Staff case is a little weird because Judge McNeil also commented on that by his opinion. He indicated very specifically that Grand Staff did not have any application, and the reason it didn't have any application is because in that particular case, the shooting that went on that ultimately resulted in the death of the plaintiff in that case was from several different sources, all of whom apparently, and this is Judge McNeil's words, apparently made contact with the and he's correct about it, that at the time that particular shooting happened, ballistics wasn't that big of a thing. Since ballistics wasn't that big of a thing, I'm not real sure that there was any ability to even know that. But here we are in 2025, this incident happened in 2021, ballistics is a thing. We are able to identify the shooter today, and that's what Judge McNeil found. And I have no reason, I think, under the law to disagree with that, and Grand Staff does not help the plaintiffs get around that fact that there is no injury that is traceable to Officer Moran or to Deputy Moskowitz or to Deputy Allen. None. Was the lawsuit filed on behalf of the father? Eric Smith? No. No, ma'am. No. So I know that you all are pretty specifically aware of the facts, but let me see if I can't move into the actual, like the qualified immunity and those issues. It kind of goes without saying that under Graham v. O'Connor that the excessive force is kind of measured against the severity of the crime. The other thing that is in consideration is going to be the amount of threat that it's made to the officers or third parties. And I'll deal with the third party issue in just a minute. I heard some things on argument that I had not heard before. And also the degree of the resistance that the perpetrator, or in this particular case Mr. Smith, was putting up against the officers. Mr. Smith had killed two people in Louisiana earlier in that day. He led officers of three or four different departments on a multi-state chase across the border into Mississippi. He was bike-stripped twice. He got out of his vehicle at least one time and took shots at officers just across the state line. He made it into Harrison County, which is where Gulfport and Biloxi are. Ultimately he was... You don't have to answer this question, but sort of like Judge Clement said, you know, when we were reading this, you know, watching enough TV, it just was slightly curious, quote-unquote, visualizing this long chase with a jillion police officers with spikes in the daytime on an interstate highway, not a backcountry road that's weaving and all of this stuff. And yet no interdiction was able to be discerned. That's not a question. That's just my cloud of thought reading through all of this stuff, but I'm not asking for an answer. I'm just trying to say with all that's admitted in the points, you know, before getting to that, I'm just trying to figure out how he avoided the spikes, et cetera, et cetera. There must be something missing here. Judge, I'm not trying to be flippant about it, you know, but TV is TV, and TV is entertainment. And I don't know that TV necessarily is reality. I understand what you're saying. Look, we do know, we do know that ultimately when the defendant, the criminal defendant, Eric Smith, was ultimately brought to a standstill, it was because of interdiction on the part of law enforcement. And they had a right to protect themselves and to protect third parties. I mean, that's the bottom line analysis that you get into when you talk about O'Connor and excessive force, okay? Now, when you use those three elements that I quoted to the court a minute ago, the Graham factors, the severity of the crime that had been, that had occurred before all of this happened, I don't know that you can get any more severe. The threat to the officers and to the public, I don't know that you could get any more severe. He had already shot at some officers earlier in the day in the chase. He had shot at some officers out on the highway, or at least in the median, just before this shooting. Shot at some officers. What I heard the court hear a minute ago was that apparently this officer was shot at. You know, I don't know what that specifically means, but I can't right now. I have a version of what I asked your friend on the other side. Can you point to any case in any jurisdiction that it is reasonable to shoot directly at a suspect when there is a substantial risk that an innocent person will be hit? Can I point to any case that, well, I can, but I got a red light. We got you here. You sat here through that other case. You know that red light's not going to save you from Judge Williams. Is this like the life ring on the TV show? Can I answer the question or no? We got you until we turn you loose. That's all you need to know. So go for it. Okay. Can I quote you a case? I cannot quote you a case, and I think that's a good thing, because then it's not clearly established. Now, I don't know that I'm willing to agree that the officer that ultimately ended up did shooting Mr. Smith aimed directly, like it's been said by the plaintiff, aimed directly at Lamello Parker. I don't know that that's true. It's not aimed at, but there's a substantial risk that the baby's going to get hit if you're trying to shoot the guy who's holding the baby. Judge, that is completely 100% true, but you know what? Those officers have got a responsibility out on that street to understand that not only under Graham, they have an obligation to protect themselves, but they've got an obligation to protect the very people that Your Honor just heard today were apparently in their cars along the roadway. They have an obligation to protect the people that ultimately, if this particular defendant were allowed to proceed down the highway, they owe an obligation to protect those people, too. So this is a classic Graham versus O'Connor equation where this is really not excessive force. It is not unreasonable force. And to be honest with you, under the Fourth Amendment analysis, it's objectively reasonable that these officers were able to stop this individual, even though it's unfortunate that Lamello Parker got hurt. But you would rewind and have us remember that the threshold is the standing argument that you're making that your client, you're saying there's no traceable injury to the one's name, right? 100%, Judge. My client did not . . . he ultimately . . . he fired in the direction of Lamello Parker and Eric Smith, but his intended target was not Lamello Parker. His intended target was Eric Smith, and he didn't hit anybody. Now, you know, standing here today, I'm thankful that he didn't because I think I can meet a more particularized, specific burden for him. There was no injury that's traceable to Mr. Moran or Allen or Moskowitz. We understand, Judge, that the ballistics indicated that the same bullet went through Baby and Smith. We understand that. I know that no bullet from Moran's gun, Allen's gun, Moskowitz's gun, did any damage to either one of these people. Everybody on the table over there either represents Moran, Moskowitz, or Allen. Is that right? Correct. And the City of Gulfport is also here. Can I take another 20 minutes? Does this short answer begin with an N and end with an O? Thank you. Appreciate it, Judge. Thank you, sir, but we do appreciate not making light at all of the circumstance, but we've read the briefs and nothing we didn't ask you does not minimize anything that's in the briefing, but as you know, oral argument is for us to get a clear understanding of what's . . . so whatever wasn't argued, it's in the briefs and we'll get it. All right. Back to you, Mr. Ekelberger. You got rebuttaled. Before you get started, can I ask you a question about the bystanders that you're focusing on? Certainly, Your Honor. Is that in the brief? I'm blanking on the brief at the moment. It certainly was in the amended complaint. And to paint this picture in something I wanted to address, counsel opposite talked about the duty to these other people on I-10. In the complaint, we plead the following facts. Eric Smith's car was immobilized, not capable of movement, stuck in the mud in the median between the eastbound and westbound lanes of I-10. The officers were on the eastbound lanes of I-10. They had drawn their weapons and pointed at a car in the median. In the amended complaint, we recount portions of a cell phone video that was taken by what appears to be a father and daughter couple. It's a father and a daughter stranded in the line of parked cars on I-10 westbound. They are behind Eric Smith's car. And in there, the father tells his daughter, we don't want to be right here. A lot of bullets could come flying this way. And she pleads with him, roll up the window, dad. And he says, it ain't going to matter, baby. Those were the people that these officers put in harm's way with their gunfire. And for them to argue now that they were trying to protect them doesn't really match up with the pled facts. All right, let's stay within the lane. This clearly, and you know, not a negligence case. Recklessness doesn't apply. Gross negligence. This is not a tort. It's 1983. The case is a legion. It's qualified immunity. You know what the standards are. We know what they are. We get your first argument it's a bad thing, but that's not in our job description. So we're there. So within the confines of where we are, Counsel Offset argues vigorously and passionately that everybody over there on that table, that you're knowing, didn't strike either Eric Smith or the baby, so they're not the shooters. So we've got the phantom defendants, the highway patrol people. And so their first argument out the door is the standing issue. So I want you to address the standing issue that's prominent here. Yes, Your Honor. Counsel Offset said essentially that Moran and these other officers didn't kill Lamello. And that is, from what we understand, true. And we plead that that is true. But that doesn't mean that they didn't try to. And that's what we plead. Yeah, but they're saying you've got to find a traceable injury. You know, it's not torts. You know, it's not, you know, it's not torts. That's the only way I know how to put it. And so, you know, he's arguing in the brief, et cetera, that you've got to show a traceable injury, which means they say not only didn't shoot, there was no impact of their bullets. So I don't know how you can get there just by saying they fired. If this was negligence, that would be different. To begin with, each of them fired and we believe struck the car. That also could be the seizure part of the Fourth Amendment. But that said, with respect specifically to standing, I would point the court to Bennett v. Speer. With respect to the traceable injury, and that's Bennett v. Speer, 520 U.S. 154, specifically at 169, that does not exclude injury produced by determinative or coercive effect upon the action of someone else. We don't know who fired first in this case. With respect to the ballistics, we don't know. We don't know which bullet was fired first. It is our contention that each of them, and this is the proposition for which we have cited Grandstaff, they had the coercive effect upon the other. Each firing each shot encouraged the other to shoot. All the ones on that table, they're lumped in with the highway patrol. Is that the kind of coercive piece you're talking about? The moment that first officer fired at Lamello Parker, the others joined in. Yeah, but that sounds like torts to me. I'm not arguing the case, but it sounds like torts to me. You're saying because they were all in there in this mass, whatever these others did, they should be lumped in. I hear the argument, but you're going to have to show me the Supreme Court case that says you can get there that way. I understand the argument you want to make to a jury. I get that clearly, but, you know, we're right here at this threshold, and the pushback is about standing. His argument, if I understood him, is saying highway patrol, shooters. Highway patrol hit Eric Smith, kills Baby, et cetera. They're not at the table. You've sued the others who were there, but I don't know the case that you can get them just because, quote, they're there. And I'm just trying to give you an opportunity, you know, to go for the juggler if you can explain to us how the panel gets there if we were, you know, so inclined. I mean, qualified immunity is stronger than AJAX is the way I put it, you know. Yes, sir. So with respect to that, Your Honor, and bearing in mind we are at the pleading stage, any or all of the other ten officers may have fired before Trooper Doe 1 did. It is entirely possible that their shots spurred Doe 1 to pull the trigger on his assault rifle. This assertion must be taken as true at this stage and is sufficient to establish the causal connection that is required between the conduct of these ten officers and the death of Llewellyn Parker. So are you saying they should have intervened with the highway patrolmen? Well, certainly there should have been command and control over this situation. There was not. That was lacking. The grand jury found that to be the case. But there certainly should have been greater communication. I don't know that failing to communicate is grounds for an excessive force or, you know, fourth or fourteenth in the claim. But certainly there should have been much greater effort at coordination. Yeah, but, you know, that's not—I mean, I've been on this Court 30 years, and I've seen a whole bunch of these. And I'll tell you, when I read these pleadings, they're just gripping to me. I'm going to just be honest. They are just gripping. But that has nothing to do with, you know, what the law is. And most often, it's 1983. The facts are egregious, but it's not torts. And so, you know, we've read the cases. We're going to read all the other cases. We'll go through it. I'm a sympathetic person. It's a 12B6. You know, they might surely win in summer judgment or something like that, but 12B6 gives me some pause. But it's in the books for a reason. You know, Iqbal in all those cases were 12B6s. So, you know, that's why I asked, was this the live complaint? So it's the amended complaint. You're not arguing that, well, the judge didn't give you a shot at amending some of the facts, so we have, you know, what we have here. So do you have remaining, assuming whatever happens here, does there remain a complaint in state court as to the highway patrol or some other actors? Yes, Your Honor. The amended complaint, which we filed the complaint in the Circuit Court of Hinds County, filed the amended complaint there prior to service in accordance with Mississippi Rules of Civil Procedure. It was then removed to federal court, and that's how we found ourselves in the Southern District. It has been remanded, of course pending this ruling here, to Hinds County Circuit Court for further proceedings on the state tort claims grounds. Your Honor. Is there a Mississippi analog to qualified immunity? It's a reckless disregard standard that we would have to. Okay, I was just curious. But there is pending in state court other things. Are those against the highway patrol? The highway patrol and the individual officers. I took your time. Give him a minute, counsel. I'm feeling charitable on Monday. I appreciate you. Thank you. I had a great time. Not that charitable. So, Your Honor, we are, as you said, at the pleading stage, and I would say that this case is different than all of those cases that have come before. When you look at the district court's order, there's not a case that comes close to these facts as we have pledged them, which are these officers, each one of the people they represent, as well as the ones who are not here today, pointed their weapons directly at Lamello and fired. Counsel, I have a theory as to why they missed. That tells you they knew they shouldn't have been doing it in the first place. Your Honor. The officer very poignantly says there's no case, but he says that's good because that means it's not clearly established. I mean, that was a strong point he made. You know, it's got to be clearly established. I mean, you're still going. Thank you, Your Honor. If I can address that. Just because the facts are more egregious than situations where this court has found qualified immunity does not apply does not mean that qualified immunity does not apply. I mean, that it applies, and I think that would be my response there. This is far more egregious than any shooting case into a car where qualified immunity has been held not to cover the officers. All right. I think we got your argument.  Thank you for both sides, and please don't take my liberty in anything undermining the severity of the case. But it's a tough case, and we seriously have looked at it, and we'll decide the case as best we can. Thank you, counsel, for both sides. Thank you, Your Honor. Thank you, counsel. All right, we'll-